Here ye, here ye, this Honorable Appellate Court for the 2nd Judicial District is now open. Honorable Robert D. McClellan, please be seated. Please be seated. Your first case on the docket this morning is 2-22-0237. Honorable Appellate, plaintiff's appellant, v. Commonwealth Edison and Exelon Corporation Defendant's Appellees. Arguing on behalf of the appellant, Mr. Michael P. Kusum. Arguing on behalf of the appellee, Mr. Matthew P. Price. Mr. Kusum, you may proceed. Thank you, Your Honor. Good morning, Your Honors. Good morning. I want to talk about reasonable inferences that we're entitled to from our complaint. Let's start with paragraph 25 of our complaint, where after a couple of foundational allegations, we allege, quote, ComEd did benefit from a scheme of bribery. Well-pleaded fact. What's the benefit? The benefit is the legislation that resulted in continued favorable rate structures with a reasonably expected benefit in excess of $150 million. As testified to in sworn testimony by Scott Volt, who I think was one of their VPs of calculating the value of this, far exceeded that. That's in sworn testimony. When you look at that, that's a fact. They haven't denied it. They aren't entitled to it being denied at this stage of the pleadings. We haven't gotten to the proof yet. As a factual matter, they won't deny it. I expect if you asked Mr. Price today, will he deny that, he won't deny it. Let's say best case scenario, they come forward and they say, well, we don't really know if we benefited. Well, then that's a fact question. Then we've got a fact that should go past the pleading stage where we're at and to the proving stage. And we see that in a lot of the cases we cite in the briefs where we're talking about approximate cause issue. Approximate cause is generally a question of fact. Here we haven't gotten a chance to do that yet. In a lot of the cases that the defense cited, like the Illinois Bell case, for example, came on appeal after summary judgment when, for example, in that case, plaintiffs have been given every opportunity to establish approximate cause. We haven't been given that opportunity yet because we're just at the pleading stage. Now, in their briefs and throughout their briefs, ComEd seeks to deny us, the plaintiff, L.E., the reasonable inferences we're entitled to from our well-pleading facts. But with those reasonable inferences, we're entitled to move beyond the pleadings on the two claims. Notably, and especially on this motion to dismiss, in addition to paragraph 25, the preceding paragraphs, ComEd has not, cannot, and will not deny that, one, it engaged in a scheme of bribery, paragraph 24. Two, it expected that its bribery would continue to benefit it by more than $150 million. It's paragraph 23, citing a deferred prosecution agreement attached to the complaint as Exhibit A. And three, as I said before, paragraph 25, it did benefit from that scheme of bribery. Also included in Exhibit A, and this comes in when we would distinguish the Coon case, which I'll talk about, we had specific facts from the deferred prosecution agreement, including that Speaker Madigan, quote, had control over what measures were called for a vote in the House and, and this wasn't discussed at all in Coon, he had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd. Again, we're entitled to the reasonable inferences from those facts, such as that Madigan actually bribed ComEd and that he did, in fact, act on those powers and went over the legislature for the benefit of ComEd. Now, why did ComEd... Do you have to allege a connection? I don't understand the question, Your Honor. Okay. Don't you believe you have to allege a connection between an alleged bribe and the ultimate passage of legislation? So that's what caused the question, Your Honor. Yeah. Okay. It's a little bit of a mess. Remember, we've got two claims, common law claim for accounting and scourgement, and there the circuit court said we didn't have to establish proximate cause. We can come back to that. Let's say proximate cause. So two requirements, cause in fact, legal cause. We can talk about remoteness, which is hanging out here a little bit. First, I remember from law school, proximate cause is kind of a murky subject, and if you read cases over and over, you're going to hear all different terms of phrase used to talk about what's legal cause, what's foreseeable, what's factual cause, but for all these sorts of languages. Here's what it comes down to. The cause in fact is he started this, this started in motion. The bribe got paid to Madigan. Madigan had the power to introduce the bill. The bill is introduced. If the bill isn't introduced, it cannot be passed. That's cause in fact. Right, but introducing a bill, calling it for a vote, how is that sufficient pleading to ensure that the bill is passed? That gets to the foreseeability and the legal cause, Your Honor, I believe, if I'm understanding your question correctly. Okay. The cause in fact, was it part of the causal chain? So part of the causal chain, if the bill doesn't get introduced, it cannot get passed. That's part of the causal chain. Think of a domino. You flick the domino. At the moment you flick it, if you don't knock it down, that domino 20 steps down, doesn't get tipped over. If the bill doesn't get introduced, i.e. that first domino doesn't get flicked, the 20th domino will never fall. So it's part of that causal chain. Boom, boom, boom. But if the third domino doesn't fall, no bill, no passage. Correct. Material intervening event. Someone steps in, picks the third domino up, and then the 4th through 20th don't fall anymore. I think. Okay. David and William, where does the Senate come in here? How has he affected the Senate in such a way that the Senate is somehow tainted? Well, here we're looking at legal cause. I'm going to bring that into the legal cause analysis. Somebody puts a new domino back where the third was removed? So at the time that they flick that first domino, they pay the bribe to ensure that Madigan introduces the bill. Is it foreseeable, it's a legal cause, is it foreseeable that that is going to result in the passage of legislation such that they are morally responsible for it? That's what foreseeability gets to, is moral responsibility. It sounds to me like you're arguing that the Senate is not an independent actor in this. And I think people who support bicameral houses would have a problem with that concept. But in any event. Maybe those people don't live in states with a one-party rule run by a man with an iron fist for multiple decades. And I don't think that we have to do that. If you live there, then you're complaining because I would look for it. Well, I think it's a reasonable inference from the scheme and from the contents of the Deferred Prosecution Agreement. And when we're looking at what a reasonable inference is, when we look at someone paying a bribe for over years, this isn't a one-off $25,000 in brown paper bag. This is an ongoing running scheme over years, as we've alleged, as we argued in the briefs. There's favors here, there's payoffs, there's guaranteed legal fees. This is a whole system. I'll say the one thing that the other cases did get right in alleging a RICO claim was someone was running a racket. Now, that's not our claim because we're not seeking legal damages. We're seeking equitable relief. But someone had a racket, whether that's a technical sense or a street sense. And what we allege was all out of the Deferred Prosecution Agreement. Madigan did have control over this. He had substantial, and if you look at the Deferred Prosecution Agreement where it said that he had substantial influence and control over fellow lawmakers concerning legislation. Not just in the House, lawmakers. And that extended across Springfield, across both houses. But doesn't that lead us right up to the separation of powers question? I'll address that, Justice. And I have one other question. Perhaps you're going to address it, which is, in what way was ComEd a fiduciary to your client? The separation of powers question? I think the most direct way- And then that second question. I just thought I'd throw it in. You're probably going to hit it. So fiduciary. I'll put a pin in that in my brain. So the most straightforward way to answer separation of powers doctrine is, we're not seeking to have you imposed and override the legislature. All the cases that ComEd cites in defense of separation of powers doctrine, all involve someone seeking to nullify or void an act, a legal act. We're not seeking that at all. Laws are going to stay in place. Rate settings are going to stay in place. But what we're saying is, if you secure those legal rights through an illegal means of bribery, public corruption of the worst sort, then you don't get to keep the benefit of that. So all those laws will stay in place. We're not asking to void a law. We're not seeking to nullify one, declare void ab initio. They'll stay in place. ComEd will collect the rates, but they don't get to keep the excess profits over and above what they would have been, absent this legislation. And that's why we need an accounting. We don't have that number. We need to go back, and we need to go in, do an accounting. That's why equitable accounting, along with constructive trust, are one of the two recognized causes of action in Illinois law to remedy the scourge of public corruption. To go to your other point, the fiduciary. So down below, we focused in on the special relationship that... Can I just recap it? Yes. So to hear your argument, I hear you saying, it doesn't matter. We're never going to have to enter into proofs or even an analysis of the legislators' motivations in passing this bill. It's sufficient that ComEd admitted, along the lines of what you said in the deferred prosecution agreement, that Speaker Madigan had substantial influence. Was that the phrase? Whatever the phrase. Yes. Substantial influence and control. I'm hearing you say, we don't need to bother with that because they've admitted everything we need, and now we just need our remedy, which does bring us back to the fiduciary question. But I just want to make sure I have that predicate correct. Yes. You're more or less saying it doesn't matter. We're not going to have to prove that Speaker Madigan influenced these legislators. It's enough that whatever ComEd, the universe of facts that's contained in the deferred prosecution agreement, that's sufficient. I would say 90%. But to more completely answer that, I would add that there has been testimony. This was public testimony that wasn't made a public document until after we filed the notice of appeal in the underlying Combat 4 case. But Representative Bob Rita, who was the chief sponsor of the bill, answered this question. He called him. He testified. We have admissible sworn evidence. For example, he was asked, what control does Speaker Madigan have over the apparatus of the House of Representatives in Illinois? Answer, he had total control. Question, based on your experience, if Madigan did not want a bill to move out of the Rules Committee, what happened? Answer, it would stay there, stay in the rules. Question, and what did that mean for the bill? Answer, that it wouldn't get passed or have a chance of getting passed. And in a bizarre exchange, he was asked, who was the chief sponsor of FEJA, one of the two bills at issue? Answer, me. Question, how did it come about that you were chief sponsor once the three bills came together? Answer, I have no idea. So there is testimony out there that would be admissible below. It's already sworn. I think it's that 408. Question, are you suggesting that he's suggesting that he had a spontaneous, and the color of the flash was purple or yellow or what? I don't understand the question. Well, he said he didn't know how something happened, that he appeared to be either the primary actor or a subservient one. So it's as if someone watched a baseball game or a football game, and you asked them what the score was, and they told you, I have no idea. I believe the implication from that is that he didn't know, and if you read the rest of the testimony, which I'm happy to supplement the record with, if you want to entertain that notion, I can follow it, is that Madigan is really the one who's running the rules committee. He picks who's on the governance committee, or the executive committee, I'm sorry, and when he wants a bill to pass, it happens, and whoever's listed as a chief sponsor is a formality. Philosophically, every right should have a remedy, and your remedy appears to be an accounting, correct? Yes. Discouragement. If the tort or the crime here is the accumulation of wealth to the extent that the parameters appear to be $150 million of profit, and the deferred prosecution fine is $200 million, that would suggest that the fine is in excess of $50 million. The money that is to be paid appears to go to the government, correct? Or is it going to some other entity? The discouragement would be to the rate payers. So I think you all have more criminal experience than the rest of us in the courtroom combined, but they paid a civil fine to the federal government. There was no restitution paid. There's never been any restitution paid. There's been no discouragement. That's just a criminal penalty. My point is, if you supposedly steal, embezzle $150 million, and you pay a fine of $200 million that goes into the state coffers that apparently was the entity that participated, either knowingly or unknowingly, in this transaction, would you disagree with my suggestion that there was a remedy to this right? No, I disagree with that at all. And why would you disagree? Well, I looked at County Cook v. Lynch for one thing. It says constructive trust and equitable accounting are approved remedies in Illinois against public officials who have profited by a breach of their fiduciary duty. Illinois courts have also expressly approved the use of these remedies against the third parties who are willing participants in schemes to cause public officials to breach their fiduciary duty. So they are still continuing to this day to enjoy the fruits of their bribery, and that will continue to accrue for years to come. Is this completely different than having to pay a civil penalty out of your General Operating Funds or Exelon's General Operating Funds? If Conrad is paying $200 million to philosophically or in the abstract, resolve the problem, what is an accounting going to achieve other than to establish that Conrad experienced a $50 million net loss? The actual benefit, I believe, was greater. I'm sorry, I didn't get that. The actual benefit Conrad and Exelon enjoyed exceeded the $150 million that the fine was premised on, and that's based on the fact that that was a result of a negotiation and there's no hard numbers that were put into that. And also the sworn testimony of Scott Voigt, Conrad's financial VP, who testified that the amount that they calculated the benefit internally far exceeded that $200 million. Okay, so you're saying you don't know what the amount of benefit really is, even though they're admitted to this amount? Correct, Judge. Okay. I know my time has expired. Just a moment. I'll attempt to come back to your fiduciary question on my rebuttal. Well, you can answer it. The fiduciary. So down below, we focused on the relationship between a utility and its customers. It says a utility has a duty unique as a public charter versus a solely private company charged not more than a fair rate. And we think that by engaging in bribery to juice its rate, basically, that it breached that duty. And we think that that is akin to a breach of fiduciary duty. And when you look more particularly at the different factors that give rise to the need or the right to a claim for accounting and discouragement under TUFO, bribery is the other one. I mean, not bribery, fraud is one that's listed in TUFO. We look at bribery as kind of the singular example of what gives rise to a need for an accounting. And that's why I mentioned Cook County v. Lynch. The municipality or, you know, they were the plaintiff. Yes, Judge. Similar to Kenroy. But there's nothing that suggests that an individual person, this would go to the standing argument perhaps, there's nothing to suggest that an individual person who's the one actually paying that money, that is profiting. Those are the cases that say there's a fiduciary relationship between the officeholder and the political entity they represent. Yes. It would read them a little broader to say that, wouldn't you agree to say that a utility has a fiduciary responsibility to its customers? There's two things. I think that the relationship of a utility to charge not more than a reasonable rate is akin to a fiduciary relationship. It's a special relationship that exists because of the relationship between parties. I'm just saying it's a little broader. And then there is that specific duty not to bribe elected officials because the officials owe a fiduciary duty to their principal, the people, and as a third party benefiting from inducing that breach, they're liable. Thank you, Justice. I have one question. You cited in your response to my hypothetical, or one of them, a constructive trust. Did you, I didn't see any points in authority relative to a constructive trust. We're not receiving a constructive trust because it's not a REM that the trust would attach to. There's not like a traceable amount of specific money. There's not a parcel of property. That's why, kind of quickly, you mentioned constructive trust and an equitable accounting. So when you look at- Well, wouldn't the equitable accounting establish whether or not there needed to be a constructive trust? It could. We're at the planning stage. We've had one complaint. I got one brief of about 12 or 16 pages down below. So if the case proceeds, that's something that could develop. And I know I'm past my time, but I'd just answer that in the comparison between constructive trust and equitable accounting. Inequitable accounting is a flexible concept and exists, quote, where such a relation exists between the parties as under established principles entitles the one to demand it of the other. That's the old Judge Cardozo opinion. And in TUFO itself, this is the- TUFO is the main case that the parties discussed for equitable accounting. It said, quote, because the need for an accounting is dependent on the particular facts of each case, there are no guidelines for determining when an accounting is warranted. It's a common law. As creative as people can be in coming up with schemes to profit, equity can be equally creative in addressing that to do justice. Thank you. You'll have an opportunity to make the vote. Thank you. Mr. Price, you may proceed. Your Honor, may it please the Court. Matthew Price on behalf of Con Ed and Exelon. I'd like to start by just taking a step back to take stock of what the plaintiff wants the Court to do. The laws that are issued here date back to 2011. They're constitutional and they're unchallenged. They established an administrative process that the ICC faithfully conducted every year to set electric rates that the ICC determined were just and reasonable, and Con Ed collected those rates. Yet plaintiff wants this Court to determine that a portion of the rates that the ICC found just were actually unjust and must be disgorged, all because of an alleged impropriety in the legislative process. An impropriety which the legislature itself subsequently addressed through a legislative restitutionary remedy. And, Your Honor, you know, you asked the question about rights and remedies, and opposing counsel said, you know, there's never been any restitution paid to customers. That's false. If you look at 220 ILCS 5-4-604.5, that's a restitutionary remedy that the General Assembly enacted after the DPA that required the ICC to hold a process to determine what amounts should be restored to customers, and the ICC directed Con Ed to disgorge $31 million, which Con Ed has done. So the legislature is the appropriate body to determine the appropriate remedy, and it adopted one, and this Court shouldn't second-guess that legislative judgment. Five other courts, the Appellate Court, the Seventh Circuit, have heard the same basic theory, based on the same allegations, and held it should be dismissed. The Illinois Supreme Court last week denied leave to appeal from the First District's decision, and this Court should follow the same well-trod path. Now, Plaintiff says the case is different because this involves an accounting, but we can talk about the elements of the accounting. I'm happy to do that, and the Circuit Court correctly held that Plaintiff didn't satisfy those elements. But more fundamentally, the purpose of the accounting here is just to have disgorgement, and to disgorge the profits that derive from legislation. That's exactly what was sought in all the other cases also. There, the claim was packaged as unjust enrichment for the purpose of disgorgement. Here, it's an accounting for the purpose of disgorgement. The upshot is the same, and Plaintiff can't avoid dismissal by slapping a new label on the same basic theory that multiple courts have already rejected. The accounting fails for the same reasons as all the prior suits, a lack of proximate cause, separation of powers, a lack of legally cognizable injury, and the foul rape doctrine, and I'm happy to talk about any of that which the Court has questions on, but maybe the place to start is where opposing counsel started with the allegation that Conrad benefited from the scheme of robbery in the complaint. What Conrad admitted in the DPA is we benefited from the, or we expected the benefit from the legislation. It said the reasonably expected benefit of the legislation was in excess of $150 million. That's at page 12 of the DPA. We didn't admit any actual benefit from the legislation. We talked about what our expectation was, and that makes sense in the context of the DPA because the purpose is to punish bad intent, so your ex ante expectation is what matters. The question of whether there are profits to be disgorged is a separate matter. Additionally, we never admitted that the bribery caused the legislation to pass. We never admitted that. Now, Plaintiff tries to fill that gap by pointing to the admission in the DPA that Madigan had control and substantial influence. Well, this is not a new allegation. It was in the DPA, and if you look at paragraph 3 of the First District's decision, it says the DPA stated that Conrad understood that Public Official A had substantial influence and control over federal lawmakers concerning legislation, including legislation that affected Conrad. So this is not a new thing. It's something the First District considered. Counsel? I was asking questions about the independent nature of the Senate and how that might be a domino or not. What about the ICC and its rate determination purpose reality? Is that an additional domino that is required to fall over in order to come to fruition? It's not only an additional domino, Your Honor, but it's a very large domino because the ICC is exercising its independent judgment. There's no allegation the ICC was corrupted in any way. The ICC exercised its independent judgment following litigated proceedings every year where it assessed all the submissions that Conrad made with respect to all the things that Conrad wanted to do, which, by the way, if you look at the legislation, what it does is Conrad commits to investing billions of dollars in things like new polls, enhanced resilience, reliability. I'm not looking for an explanation, either an admission denial or I don't know. The enabling legislation that was the subject of the action in the House and the Senate, did that really enable the ICC to set the rates and then the rates were set by the ICC? And the alleged profit or income of $150 million was based upon the rates that the ICC was going to most likely grant, based upon the actuarial evidence that ComEd and the state would present to the ICC? That's correct. It set up a rate-making process, and then the ICC held rate-making proceedings in which it assessed every piece of evidence, determined whether every cost was prudent and reasonable, and then some costs rejected, others approved, and then all that rolled up into the rate that ComEd charged customers, and the profit that the plaintiff wants to score is just part of the rate that was collected. It's not some separate thing. It's part of the rates that ComEd charged that the ICC authorized, and once the ICC authorized, ComEd was legally obligated to charge those rates under Section 9240 of the Public Utilities Act. So, yes, it is a very large domino. The ICC exercised its independent judgment and approved rates, and that really goes to the core of the filed rate doctrine argument that the Seventh Circuit accepted. And, you know, counsel says, well, you know, that was a case in law. This is a case in equity. Well, the filed rate doctrine applies to both, and if you look at the Pusiteri case, which I think is the one case about the filed rate doctrine I'd urge the Court to look at in addition to South Branch, the Pusiteri case involved a claim for disgorgement, and you can see that in paragraph ‑‑ I have it written down here to direct you, paragraph 10. The State sought disgorgement in that case. The State, acting as a customer, sought disgorgement in that case, and the plaintiff in that case, Pusiteri, said his response to the filed rate doctrine in that case was, well, I'm not seeking to countermand any, this is a quote, I don't seek to countermand any rate‑making decisions because he's asking the Court only to review the utility's conduct in order to disgorgement. And he says that doesn't countermand a rate. That's in paragraph 10. Well, the Supreme Court rejected that argument and said, no, you are, in substance, countermanding a rate because these rates were authorized, required to be charged, and now you're saying a part of them should be given back because of alleged bad conduct. And the filed rate doctrine bars that claim. So I'd urge the Court to look at Pusiteri in that regard. And, you know, the independent voters case and the citizens utilities case both involve the filed rate doctrine as well as apply to actions in equity where disgorgement was the remedy that was sought. So we think the filed rate doctrine is a very easy way for the Court to disclose the case. I did want to address the proximate cause issue a little bit further. All this testimony that's being quoted from the podium that has never been in a record, respectfully, that's entirely improper, is never briefed, never in the complaint, never the subject of any supplemental notice. But in any event, to me, it underscores the problem here. Because in order to prove that there's a causal relationship, in other words, you know, thinking about the dominoes, that the bribery really caused the legislation to pass so that you can draw that connection, think about what the trial court would need to do. It would need to undertake testimony from legislators, document discovery of legislative staff. It's precisely that very invasive inquiry into another branch of government that courts, including the First District, recognize is improper under the separation of powers and something that can't survive a proximate cause inquiry. Because proximate cause is about, in part, not just whether something can be foreseen, but rather whether there's some independent judgment that's being exercised in the middle of this chain of causation. And here legislators are not dominoes. There are individuals that have been elected to represent the public interest and are presumed by the court to act with integrity and to exercise their independent judgment. There's never been any allegation about any other legislator. And you can't trace proximate cause through the independent judgment of 110 legislators who enacted this bill. And there's the additional proximate cause problem of directness. The idea of 20 dominoes underscores the point because you need to have a direct connection. You can't have 20 dominoes in between the alleged wrong and the alleged injury. You need to have a direct connection. And I think, Justice McClure, your point as to the Senate underscores that, the ICC obviously, but also the House vote. Do you recall what the votes were? It's in our brief, Your Honor. We have a chart in our brief describing the votes. It was a bipartisan vote, overwhelming majority in both houses. One of the legislation was sufficient to override a gubernatorial veto. The other one was posted up. Was the dispersion or the percentage of votes in favor of it roughly the same percentage or a different percentage between members of the Republican vis-a-vis the Democrat party? I don't have the exact statistical number, but just by eyeballing that, and I can point you to the page in our brief, you'll see that it was very bipartisan in terms of the support. It's on page, let me find it for you, Your Honor. Nineteen. Nineteen, yeah. So we have, for Iowa, you had, in fact, you had 39 Democrats vote in favor in the House, 35 Republicans voted in favor of the House in the Senate, 23 in 14. For FIJA, the other bill, you had 44 Democrats in favor, 19 Republicans, 24 Democrats in the House, in the Senate, 24 in eight. So it was substantially bipartisan, not just a matter of one Republican voting for it. I did want to address the accounting issue and your question about fiduciary duty. The accounting really is a square peg in a round hole. It's an informational remedy for a situation in which another party is holding funds in which the plaintiff has an interest. So you see it typically in cases like trusteeship, joint venture, a partnership, an executor, where one party is holding funds or has control over funds, and the other party wants to understand what's happened to them. Is it possible to have a request in accounting, even though the funds that are in contention haven't been determined to belong to anybody, or does there have to be a judicial or an admission that the plaintiff who's seeking this has standing on the basis that they have some interest in the alleged fund? That's exactly right, Your Honor. If you look at the electric contractor's case, what that holds is there needs to be some legal entitlement by a plaintiff to funds that are being held by another party. And in the absence of that ownership interest that the plaintiff has, there can't be an accounting. So you're exactly right. And that's a threshold issue here that plaintiff has never grappled with or replied to in their reply brief. So I think that's enough right away to affirm the disposition on the accounting claim. But also at the threshold, an accounting claim needs to be tethered to some other kind of claim. Again, it's an informational remedy that is designed to be able to afford a plaintiff complete relief that the plaintiff otherwise would be unable to obtain. But there initially needs to be some basis separate from the accounting on which equity can attach. And here there is no other claim that exists. So typically it's a breach of fiduciary duty claim or a common law fraud claim. Here there's nothing. And so we quote the Sharpe's case that holds that, and the Webster case also holds that. Again, this is a threshold issue that plaintiff has never even replied to, but we think is enough to dispose of the accounting claim. The third thing at the threshold is there needs to be an inadequate legal remedy. And here I referenced earlier the ICC proceeding where the ICC engaged in, again, a litigated proceeding to determine what appropriate restitution would be under a statute. Plaintiff is free to participate in that. And, in fact, the plaintiffs in the first district case did participate as parties. The plaintiff could have sought discovery in that proceeding, trying to get whatever information the plaintiff wants from this proceeding. He didn't participate. And you can't stand at the sidelines and not exhaust your rights and then come in and demand an accounting. So, again, that's another issue that plaintiff never grapples with but is at the threshold. Well, there are two defenses, I think, to an accounting or at least aspects. One is an inadequate remedy of law. And the other problem or problematic aspect of granting relief is that there is no remedy of law. And so if you can't preliminarily allege that you're entitled to an accounting based upon an inadequacy in the remedy or you haven't alleged a remedy at law, then you don't have – I don't know if you want to call it standing, but it's an element that you failed to establish in order to obtain what is essentially equitable relief. That is not – because it obviously isn't at law because one of the preliminaries you have to establish is you don't have a remedy at law. And there are only two remedies that I'm aware of. One is equitable and the other is the common law, seven famous writs. So does anybody have any other questions? No, sir. Thank you. Thank you very much. You may proceed, Mr. Person. Thank you, Your Honor. Pursuant, is it correct? Pursuant. I'll start off with looking at the statement that you were just talking about. Will you establish cases instructive on that around page 703 where the court said, plaintiff realistically cannot be expected to outline intricate schemes and specific measures or methods of control used by Stavros, the person exercising the control of the Madigan in the situation, for such schemes or to detail the secret dealings with the public officials with exactitude. Court continued, even if we were to find that the pleading lacked specific allegations of fraud and the breach of a fiduciary duty, the imposition of a constructive trust, in this instance we're substituting accounting for constructive trust, nonetheless would still be proper. Stavros is incorrect in assuming that a constructive trust may only be imposed where there's a fraud or a breach of fiduciary relationship. So this is what I was getting back to at the end of my opening statement of equity. It is flexible. That is why we have it. It fills in the gaps left by the law. I also want to talk real quickly about the Pusateri case because Pusateri was a case, it wasn't brought by the state, it was brought by a relater under the False Claims Act. It seemed like the plaintiffs below seeking trouble damages and punitives. It alleged basically that the gas company was getting more money than it should because of unreported gas leaks. And there, the court said, at its heart, Pusateri's complaint alleges PG used fraudulent means to get the state and others to pay too much for natural gas. While the False Claims Act would subject PG to civil penalties of $5,500 to $11,000, PG would also be subject to paying trouble damages for its actions. So, again, the plaintiff in Pusateri wasn't seeking disgorgement. The plaintiff was seeking trouble damages under the FCA, just like other people were seeking trouble damages under RICO. So, again, you look at the difference here of when a complainant is really seeking disgorgement of the proceeds of criminal activity versus seeking legal damages or seeking the proceeds of the criminal activity to be disgorged. What is your response, if any, to my questions, Mr. Price, regarding the ICC and it being, for want of a better term, an intervening cause? Well, I think it would take a long discussion as to how the particular legislation at issue constrained the authority of the ICC to engage in any rate setting. So when you look at the Deferred Prosecution Agreement, when it said that they wanted continued favorable treatment, the continued favorable treatment was they wanted a good deal at the ICC and they wanted the legislature to lock in the process. So it would take quite a bit to discuss that. In terms of where does it fall in the realm of foreseeability, if what you're doing in Bradman-Madigan is to get the bill passed to constrain what the ICC can do because you want to get paid immediately instead of having this trailing reimbursement on your investments, that's foreseeable. If the very bill that you're seeking works, and let me back up for a second on this idea of proximate cause. Why are they bribing Madigan to begin with? Now, foreseeability is an objective standard. It's not subjective, but we don't have to be naive. They're bribing them precisely because it's foreseeable. You don't pay a bribe to a corrupt legislator without it being foreseeable that the bribe is going to work. Don't be bribery that it rises payment or consideration for not doing something as well as doing something. Well, that's probably, if we're being really honest, in my opinion, Madigan was a bit of an extortionist. And people knew that if you don't play ball, you don't get what you want. And it's as much a matter of that, of making sure you don't get disfavorable treatment, as much of getting favorable treatment. But on that point, the L.A. Coliseum case is instructive. And the case said, our holdings sends a message. If a corrupt public official demands an extortion payment in exchange for a public contract, the victim should not pay. Instead, the victim should report the corrupt public official to local, state, or federal law enforcement. If the victim pays and the extortion is discovered, the victim will not be permitted to retain any consideration received. The reason is simple. A public contract obtained through an extortion payment is not valid, and no one should believe that it is valid. A bright line rule is required. And I'm asking this court to sit the same bright line rule that says to companies, contractors, vendors in the state of Illinois, big and small, if you pay to play, you don't get to keep the benefits. Are there any other questions on proximate cause? Or I'd remind the court that it's not just the common law claim for accounting and disgorgement that we're proceeding, but also the statutory claim for consumer fraud under Robinson v. Toyota, which contrary to the briefing by the defendant, after Robinson v. Toyota, you can bring a claim for harmful conduct, not just deceptive conduct. There's no requirement of actual reliance. If there's no further questions, I'll move. Any other questions? Thank you. We will take the case under advisement. We have other cases on the call. We're going to take a short recess. All rise.